USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___3/27/2023___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASE PROPERTY SERVICES, LLC,

                Plaintiff,

    -against-

COLUMBIA PROPERTIES PHOENIX, L.P.,
COLUMBIA SUSSEX CORPORATION,
CHRISTOPHER J. BALLAD, and COLUMBIA
PROPERTIES MINNEAPOLIS, LTD.,

                Defendant.

No. 17 Civ. 3110 (NSR)

**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge

Plaintiff Case Property Services, LLC ("Plaintiff," or "CPS") commenced this action against Defendants Columbia Properties Phoenix, L.P. ("Columbia Phoenix"), Columbia Sussex Corporation ("Columbia Sussex," or "CSC"), Christopher J. Ballad ("Mr. Ballad"), and Columbia Properties Minneapolis, Ltd. ("Columbia Minneapolis") (collectively, "Defendants"), asserting common law claims for breach of contract, account stated, unjust enrichment, and breach of personal guaranty. (First Amended Complaint ("FAC"), ECF No. 12.) Plaintiff also asserted a claim for a violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, but this Court dismissed that claim in an Opinion & Order dated September 17, 2018. (ECF No. 28.)

Presently before the Court are (1) Defendants' motion for summary judgment on all of Plaintiff's claims (ECF No. 68); and (2) Plaintiff's cross-motion for partial summary judgment on its claims for breach of contract, unjust enrichment, and breach of personal guaranty (ECF No. 77). For the following reasons, the Court GRANTS in part and DENIES in part Defendants' motion for summary judgment, and the Court DENIES Plaintiff's cross-motion for partial summary judgment.

1

# BACKGROUND

## I.    Factual Background

The parties have submitted briefs, statements of material facts pursuant to Local Civil Rule 56.1, and the record and exhibits from discovery in the instant proceeding, which reflect the following factual background.[1]

### A.  The Phoenix and Minneapolis Loans

Columbia Phoenix owns the Phoenix Airport Marriot Hotel ("Phoenix Hotel") in Phoenix, Arizona.  (Defendants' Rule 56.1 Statement ("Defs. 56.1") at ¶ 1, ECF No. 69-1.)  Columbia Minneapolis owns the Minneapolis Marriott Hotel ("Minneapolis Hotel") in Minneapolis, Minnesota.  (*Id.*)  Both Columbia Phoenix and Columbia Minneapolis entered into loan agreements (the "Phoenix Loan" and "Minneapolis Loan," respectively), one collateralized by the Phoenix Hotel and the other by the Minneapolis Hotel.  (Plaintiff's Rule 56.1 Statement ("Plf. 56.1") at ¶ 1, ECF No. 75.)  These loans were placed into a multi-tranche commercial mortgage-backed security ("CMBS").  (Pinewski Tr. 28:20-29:10; Chopp Tr. 33:12-23, 229:24-230:18.)  As of February 16, 2017, Columbia Phoenix owed $66,162,892.67 on the Phoenix Loan (Plf. 56.1 at ¶ 107), and Columbia Minneapolis owed $59,777,105.32 on the Minneapolis Loan (*id.* at ¶ 109).

---

[1] Citations to "Defs. Ex." refer to the Exhibits attached to the Declaration of David B. Picker, Esq. in Support of Defendants's Motion for Summary Judgment.  (ECF Nos. 70–71.)  Included in Defs. Ex. are the Exhibits attached to the FAC.  (*See* Def. Ex. A.)  Citations to "Defs. Opp. Ex." refer to the Exhibits attached to the Declaration of David B. Picker, Esq. in Opposition to Plaintiff's Cross-Motion for Partial Summary Judgment.  (ECF No. 74.)  Citations to "Plf. Ex." refer to the Exhibits attached to the Declaration of Benjamin M. Rattner in Support of Plaintiff's Cross-Motion for Partial Summary Judgment.  (ECF No. 80.)  Citations to "Plf. Opp. Ex." refer to the Exhibits attached to the Declaration of Benjamin M. Rattner in Opposition to Defendants' Motion for Summary Judgment.  (ECF No. 76.)

Citations to the Deposition of Shlomo Chopp ("Chopp Tr.") refer to Defs. Ex. D, Defs. Opp. Ex. Y, Plf. Ex. 2, and Plf. Opp. Ex. 1.  Citations to the Deposition of Christopher Ballad ("Ballad Tr.") refer to Defs. Ex. E, Defs. Opp. Ex. Z, Plf. Ex. 5, and Plf. Opp. Ex. 3.  Citations to the Deposition of Michael Pinewski ("Pinewski Tr.") refer to Defs. Ex. F, Plf. Ex. 1, and Plf. Opp. Ex. 2.

A CMBS is composed of multiple classes, or "tranches."  Investors buy into different tranches, and they are repaid with interest generated by the loan.  "A" tranche investors are paid first, "B" tranche next, "C" after that, and so on and so forth.  "A" tranche investors carry less risk because they are repaid first.  More junior classes are paid later and thus carry a higher risk of non-payment, but they also reap higher interest payments.  Because "A" tranche investors receive payment first, a borrower's default will first trigger losses for more junior tranche investors.  These more junior tranches are "wiped out" by the losses, and when that happens, the most junior tranche becomes the "controlling class until that class loses 75 percent of its value."  (Pinewski Tr. 30:18-31:12.)  In the event of default, the controlling class appoints a "special servicer" to administer the loan.  (Chopp Tr. 60:17-19.)  In so doing, the special servicer has three options: (1) foreclose the underlying property; (2) modify the defaulted loan; or (3) sell the loan to a controlling class member at a fair value price.  (Chopp Tr. 60:8-65:14; Pinewski Tr. 89:9-95:20.)

The Phoenix and Minneapolis Loans were approaching maturity default.  (Plf. 56.1 at ¶ 68.)  These non-performing Loans were held in a CMBS for which Triangle Capital ("Triangle") was the controlling class member.  (Ballad Tr. 33:14-34:4.)  CW Capital Asset Management LLC ("CW Capital") was the special servicer on the Loans until August 2016, when it was replaced by C-III Asset Management ("C-III").  (Plf. 56.1 at ¶¶ 22–23; Defendants' Response to Plaintiff's Rule 56.1 Statement ("Defs. 56.1 Resp.") at ¶ 23, ECF No. 75.)  As the controlling class member, Triangle owned the right to approve any actions of CW Capital (or later C-III).  (Pinewski Tr. 32:1-11.)  Triangle also owned the right to purchase the Loans at a fair value price.  (*Id.*)

### B. The Consulting Agreement Between CPS and Defendants

CPS provides consulting services to distressed borrowers.  (Plf. 56.1 at ¶ 9.)  Shlomo Chopp ("Mr. Chopp") is one of CPS's principals.  (*Id.* at ¶ 8.)  On January 14, 2015, Columbia Phoenix,

through its corporate agent and Chief Financial Officer Christopher Ballad, entered into a consulting agreement (the "Agreement") with CPS set to expire on October 31, 2015.  (Defs. Ex. A at Ex. 1.)  Mr. Ballad was aware of the personal guarantee language in sections 1, 2, 4, and 5 of the Agreement, including language stating that "the authorized signatory for the Borrower hereby personally guarantees full payment of the Debt Reduction Fees."  (Agreement § 5.)  Mr. Ballad, however, believed the personal guaranty was unenforceable because he signed once in his capacity as corporate agent and did not sign a second time in his individual capacity.  (Ballad Tr. 46:4-49:19.)

CPS was retained by Columbia Phoenix to "obtain[ ] a reduction, repurchase, acquisition and/or release of debt owed by the Borrower as of the date hereof."  (Agreement at 1.)  CPS's goal, in other words, was to reduce the amount of the Phoenix Loan.  (Ballad Tr. 50:16-52:21.)  If CPS "directly or indirectly" contributed to "an agreement or arrangement full[y] executed and entered into between Borrower and Lender" that resulted in the "reduction or forgiveness of the agreement amount due under a Loan," the Agreement obligated the Borrower—here, Columbia Phoenix—to pay a "Debt Reduction Fee."  (Agreement § 5.)  The Debt Reduction Fee is payable "for each Loan" for which CPS provided services, "regardless of whether the execution of the documents evidencing" the agreement "occur[ed] prior to or after the expiration of the Term, or termination of this agreement."  (*Id.*)

Columbia Sussex owns CSC Holdings, LLC ("CSC Holdings"), which in turn owns hotels and is the parent company of Columbia Phoenix and Columbia Minneapolis.  (Ballad Tr. 282:21-283:4.)  Less than a month after Columbia Phoenix and CPS entered into the Agreement, Columbia Sussex and CPS entered into a Related Entities Agreement (the "Related Entities Agreement").  (Defs. Ex. A at Ex. 2.)  Columbia Sussex agreed that "if and to the extent that" CPS provided

"Consulting Services" to Columbia Sussex "and/or" to any "Related Entities," including Columbia Minneapolis, "said Consulting Services" would be subject to "all of the terms" of the Agreement, including the payment of fees in Schedule A, "but only to the extent that" Columbia Sussex "and/or the Related Entities retains ownership of the associated properties." (*Id.*)  The Related Entities Agreement then outlines when Columbia Sussex would *not* pay a "Debt Reduction Fee," for a "Related Entity's loan," "in respect of such entity." (*Id.*)  The Fee would not "be payable by" Columbia Sussex "in respect of" a Related Entity *if* the Related Entity's loan was not "(a) restructured with CSC or an affiliate under an agreement that provides for CSC or an affiliate to retain ownership and control or (b) acquired by CSC or an affiliate via a note purchase or discounted payoff." (*Id.*)  At minimum, the Related Entities Agreement "makes the terms of the Consulting Agreement applicable to Columbia Minneapolis and other entities and properties specifically identified therein." (Defs. 56.1 Resp. at ¶ 46.)

On September 23, 2015, CPS and Columbia Phoenix extended the Agreement, as modified by the Related Entities Agreement, through December 31, 2015. (Defs. Ex. A at Ex. 3.)  On November 17, 2015, the parties further modified the Agreement, specifically the payment of fees in Schedule A. (*Id.* at Ex. 4.)  Schedule A, as amended, reads as follows:

i.   The Debt Reduction Fee schedule shall be 10% of any debt forgiveness including accumulated non-default interest.

ii.  The Debt Reduction Fee shall not be less than $250,000 or greater than $2,000,000.

    1.  Notwithstanding the forgoing, the payment schedule and fee shall be determined as follows:

        a.  Upon the execution of a modification involving an A/B Split documents with the Lender, Borrower shall pay Consultant an amount equal to 2% of the B-Note/Hope Note/Subordinate Note or however it shall be classified (the 'A/B Mod Fee'). This fee, however, shall not be less than $250,000.

b. Upon the repayment of the loan, Borrower shall pay Consultant a Debt Reduction Fee in the amount of 10% of the actual debt reduction achieved minus the A/B Mod Fee already paid. For avoidance of doubt if 10% of the debt reduction achieved is equal to or less than the A/B Mod Fee already paid, no additional payment will be due.

(*Id.*)  The Agreement expired on December 31, 2015 and was subsequently reinstated through December 31, 2016.  (*Id.* at Ex. 5.)  On December 9, 2016, Mr. Chopp sent Mr. Ballad a third extension agreement.  (Plf. Ex. 8.)  Mr. Ballad did not sign the extension, and the Agreement expired on December 31, 2016.  Nonetheless, Mr. Ballad remained "open to the possibility of reinstating the Agreement, after it expired, if Plaintiff could be helpful" and "if Plaintiff renegotiated certain terms."  (Defs. 56.1 Resp. at ¶ 54.)  Further negotiations were to no avail.  (*Id.* at ¶¶ 53–54.)  On February 8, 2017, Mr. Ballad emailed Mr. Chopp to confirm the Agreement had "expired" according to its terms and had "not been renewed."  (Plf. Ex. 31.)  CPS thus "no longer represent[ed]" Defendants.  (*Id.*)

### C.  CPS's Efforts to Reduce Defendants' Debt

After the parties entered into the Agreement on January 14, 2015, Mr. Chopp arranged for a meeting in August 2015 between Michael Pinewski ("Mr. Pinewski"), a Triangle principal; Ian Ross, another Triangle member; and Mr. Ballad.  (Ballad Tr. 79:9-14, 87:6-24.)  The "meet and greet" lasted "45 minutes to an hour."  (Pinewski Tr. 37:7-38:1.)  Mr. Chopp did not attend.  (*Id.* at 37:2-6.).  Mr. Chopp, however, served as the liaison for Mr. Ballad and Triangle, from August 2015 through February 2017.  (Plf. 56.1 at ¶ 67.)

Throughout 2015, Mr. Chopp "gathered information and prepared several 'models' of the potential future financial performance" of the Phoenix and Minneapolis Hotels.  (Defs. 56.1 at ¶ 26.)  These models formed the basis of an "A/B modification proposal" that was presented to

David Smith of CW Capital and subsequently rejected. (*Id.* at ¶ 27.) An "A/B split" is a "standard way of restructuring a loan," wherein a debt is "split into two notes"—"A" and "B"—"which together are the same as the total of the original loan." (*Id.* at ¶ 29.). The "A" note is paid on a current basis, whereas the "B" note "gets paid only if, and only to the extent that, there is sufficient cash from operations and/or capital event to pay it." (*Id.*)

In the summer of 2016, the Phoenix and Minneapolis Loans went into maturity default. (Plaintiff's Response to Defendants' Rule 56.1 Statement ("Plf. 56.1 Resp.") at ¶ 43, ECF No. 76-1.) As the Loans went into default, Mr. Chopp and Mr. Pinewski continued their "ongoing," albeit sporadic, "dialogue," which had started in 2015 and continued throughout 2016. (Pinewski Tr. 197:20-199:8; Chopp Tr. 450:9-24.) By email, phone calls, and text messages (Pinewski Tr. 198:10-23), the two discussed possible transactions related to the Phoenix and Minneapolis Loans. (*Id.*) In particular, they discussed a "framework" for the transactions, including potential terms. (Pinewski Tr. 62:3-10, 195:13-22; Chopp Tr. 452:8-454:9.)

On October 14, 2016, Mr. Chopp and Mr. Pinewski discussed the price Defendants would be willing to pay to repurchase the Loans if Triangle bought them. (Pinewski Tr. 216:9-14, 233:10-234:7.) Triangle, however, did not have the capital to "outright purchase" the Phoenix and Minneapolis Loans. (Plf. 56.1 at ¶ 73.) Given its lack of capital, Triangle approached Taconic Capital ("Taconic") in the latter half of 2016 to propose a deal "under which Triangle would assign its options to purchase the [Loans] to Taconic and take a smaller share of the overall deal." (*Id.* at ¶ 74.) Taconic agreed. Triangle assigned to Taconic its option to purchase the Loans. (Pinewski Tr. 108:18-109:13.) The two entered into joint venture agreements to create new entities through which they purchased the Loans for a discounted price of approximately $56 million.[2] (Pinewski

---

[2] Triangle owned 10% of the joint venture. (Defs. 56.1 Resp. at ¶ 76.)

Tr. 223:13-225:8.)   The Triangle-Taconic joint ventures were formed in December 2016 (Plf. Ex. 12), and they finalized the acquisition of the Loans in February 2017.[3]  (Plf. 56.1 at ¶ 85.)

Although the Agreement expired on December 31, 2016, Mr. Chopp continued to communicate with Triangle and Mr. Ballad.  He liaised between the two parties to schedule times for Triangle to tour the Phoenix and Minneapolis Hotels.  (Plf. Exs. 23, 24.)  Defendants also continued to provide proprietary information, *e.g.*, Smith Travel Reports, to Mr. Chopp upon request.  (Ballad Tr. 167:12-168:23.)  Mr. Chopp then informed Mr. Ballad that Triangle wanted to meet at its New York office to discuss the Phoenix and Minneapolis Loans.  (Plf. Ex. 25.)  Mr. Chopp and Mr. Ballad agreed to meet with Mr. Pinewski at Triangle's New York office on February 9, 2017, and Mr. Chopp "circulate[d] an outlook invite" for breakfast and the meeting.  (*Id.*)

Prior to the meeting, Defendants engaged Ladder Capital Finance LLC ("Ladder Capital") to finance Defendants' acquisition of the Phoenix Loan from the Phoenix JV.  Defendants and Ladder Capital began discussing financing for the transaction in November or December 2016.  (Plf. 56.1 at ¶ 95.)  On January 10, 2017, Mr. Ballad emailed Ladder Capital: "Following on from our conversation earlier about the Loan App, I wanted to clarify with you that I have a consultant/broker," CPS, "that we will have to pay a fee of up to $2M too on this deal."  (Plf. Ex. 26.)  Mr. Ballad, however, was unaware at that time "whether Triangle would actually buy the loan" and "he had no idea who Taconic was."   (Defs. 56.1 Resp. at ¶ 96.)  Further, the Agreement had expired, and Mr. Ballad and Mr. Chopp had not yet decided whether to reinstate the Agreement as they had done in 2016; as such, "the situation was entirely up in the air."  (*Id.*)

---

[3] Phoenix – 1101 North 44th Street LLC (the "Phoenix JV") purchased the Phoenix Loan.  (Plf. Ex. 34.) Bloomington – 2020 East 79th Street LLC (the "Minneapolis JV") purchased the Minneapolis Loan.  (Plf. Ex. 38.)

Taconic asked Defendants to complete pre-negotiation agreements ("PNAs") for the Phoenix and Minneapolis Loans.  To ensure the PNAs were executed before the February 9, 2017 meeting, Taconic sent them to Mr. Pinewski, who in turn sent them to Mr. Chopp.  (Plf. Ex. 27.) Mr. Chopp then sent the PNAs to Mr. Ballad on February 7, 2017, highlighting that he "now . . . kn[e]w who (Triangle's) partners are."  (Plf. Ex. 28.)  Mr. Chopp, however, had not heard of Taconic prior to Taconic entering into joint venture agreements with Triangle to purchase the Loans.  (Chopp Tr. 536:3-19.)  The next day, Mr. Ballad sent Mr. Chopp an email confirming Defendants had terminated the Agreement and were not going to reinstate it.  Noting that Mr. Chopp "no longer represent[ed]" the Defendants, Mr. Ballad instructed Mr. Chopp to not attend the February 9, 2017 meeting.  (Plf. Ex. 31.)

The meeting was rescheduled to February 13, 2017 due to weather, and on February 17, 2017, James Jordan of Taconic circulated term sheets for the restructured Phoenix and Minneapolis Loans to Mr. Pinewski and Mr. Ballad.  (Plf. Ex. 32.)  Meanwhile, on February 22, 2017, Ladder Capital provided Mr. Ballad a term sheet for the loan agreement between Columbia Phoenix and Ladder Capital that would give Columbia Phoenix the liquidity it needed to purchase the Phoenix Loan from the Phoenix JV.  (Plf. Ex. 26.)  The term sheet contemplated that Ladder Capital would issue to Columbia Phoenix a maximum loan of 85% of the "discounted payoff" of the Phoenix Loan, which was estimated to be nearly $44 million.  (*Id.* at CSC019470.)  The term sheet also contemplated that Ladder Capital would issue additional credit to cover Columbia Phoenix's payment of a $2 million "discounted payoff" consultant fee to CPS.  (*Id.*)  In the term sheet executed by Mr. Ballad and returned to Ladder Capital on February 24, 2017, Mr. Ballad crossed off the $2 million fee.  (*Id.*)

### D.  Acquisition of Phoenix and Minneapolis Loans

That same day, the Phoenix JV entered into a term sheet with "New Lender," CSC Holdings, and "7 Nevada Trusts" (the "Yung Family Trusts") (collectively, the "New Loan Purchasers"). (Plf. Ex. 33.) Although the New Loan Purchasers purchased the Phoenix Loan for $44.5 million (the "Phoenix Transaction"), the face value of the Loan—now broken into three notes ("A," "B," and "C")—still totals approximately $66.1 million (the amount of the Loan outstanding prior to the Transaction). (*Id.*) Put differently, Columbia Phoenix (the borrower) still owes $66.1 million, though now it owes the money to the New Loan Purchasers, who acquired the Loan for over $20 million less than face value. (*Id.*) Specifically, Columbia Phoenix owes $37 million for the "A" Note held by Ladder Capital (the "New Lender"), $6.5 million for the "B" Note held by CSC Holdings, and approximately $2.9 million for each of the seven "C" Notes held by the Yung Family Trusts. (Plf. Ex. 34 at § 1.3.) The "A" Note is secured by the Phoenix Hotel, and the "B" and "C" Notes are unsecured. (*Id.* at § 1.3, Exs. C-1.) In effect, only $37 million of the Phoenix Loan is now secured by the Phoenix Hotel: $29 million less than the amount collateralized prior to the Transaction.

The Minneapolis JV entered into a similar term sheet on March 23, 2017, selling the Minneapolis Loan—which had a face value of approximately $59.8 million—for $29 million to the New Loan Purchasers (the "Minneapolis Transaction"). (Plf. Ex. 37.) Columbia Minneapolis (the borrower) still owes a debt of $59.8 million (the amount of the Loan outstanding prior to the Transaction); it owes $20.3 million for the "A" Note held by Ladder Capital, $7.7 million for the "B" Note held by CSC Holdings, and approximately $4.5 million for each of the seven "C" Notes held by the Yung Family Trusts. (Plf. Ex. 40 at § 1.3.) The "A" Note is secured by the Minneapolis Hotel, and the "B" and "C" Notes are unsecured. (*Id.* at § 1.3, Exs. C-1.) In effect, only $20.3

million of the Minneapolis Loan is now secured by the Minneapolis Hotel, nearly $40 million less than the amount collateralized prior to the Transaction.

### E.  CPS's April 5, 2017 Invoice

Upon the closing of the Phoenix Transaction, CPS sent Defendants an invoice, dated April 5, 2017, for a $2 million Debt Reduction Fee.  (Plf. Ex. 39.)  CPS commenced the present lawsuit on April 27, 2017.  (Plf. 56.1 at ¶ 143.)  Defendants were "not advise[d]" of the filing of the lawsuit until May 2, 2017.  (Defs. 56.1 Resp. at ¶ 143.)  On April 28, 2017, Mr. Ballad sent a letter responding to the invoice.  (Defs. Ex. B at Ex. A.)  He repeated his "previous confirmation" that the Agreement "expired in accordance with its terms (as amended) on December 31, 2016."  (*Id.*)  As such, Mr. Ballad "reject[ed]" the invoice "as an attempt to manufacture the appearance of an obligation where none exists."  (*Id.*)  "For the avoidance of doubt," Mr. Ballad continued, "the consulting fee set forth in [the] invoice was not earned and is not owed."  (*Id.*)

## II.  Procedural History

Plaintiff filed this action on April 27, 2017 alleging claims for breach of contract, account stated, unjust enrichment, and breach of personal guaranty.  Plaintiff also asserted a claim for a violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, which this Court dismissed in an Opinion & Order dated September 17, 2018.  Defendants filed a motion for summary judgment on all remaining claims, and Plaintiff files a cross-motion for partial summary judgment on its claims for breach of contract, unjust enrichment, and breach of personal guaranty.[4]

---

[4] Both motions were fully briefed as of March 2, 2020.  (Defendants' Motion for Summary Judgment, ECF No. 68; Defendants' Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Defs. Mem."), ECF No. 69; Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Plf. Opp."), ECF No. 76; Defendants' Reply Memorandum of Law in Further Support of Defendants' Motion for Summary Judgment ("Defs. Reply"), ECF No. 73; Plaintiff's Cross-Motion for Partial Summary Judgment, ECF No. 77; Plaintiff's Memorandum of Law in Support of Plaintiff's Cross-Motion for Partial Summary Judgment ("Plf. Mem."), ECF No. 78; Defendants' Memorandum of Law in Opposition to Plaintiff's Cross-Motion for Partial Summary Judgment ("Defs. Opp."), ECF No. 72; Plaintiff's Reply Memorandum in Further Support of Plaintiff's Cross-Motion for Partial Summary Judgment ("Plf. Reply"), ECF No. 74.)

**LEGAL STANDARDS**

Under Federal Rule of Civil Procedure 56(c), summary judgment must be granted if "there is no genuine issue of material fact and . . . the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 n. 4 (1986). "[G]enuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, [while] materiality runs to whether the dispute matters, *i.e.*, whether it concerns facts that can affect the outcome under the applicable substantive law." *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 5 (2d Cir. 1999) (internal quotations and citations omitted). To prove that a genuine issue of material fact exists, a plaintiff "may not rest upon the mere allegations or denials of the pleading[s]," but must by affidavit or otherwise "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "Conclusory statements, conjecture or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996).

Courts must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. *See Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). The moving party bears the initial burden of demonstrating an absence of genuine issues of material fact. *See Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997). If the initial burden is met, the non-moving party "must produce specific facts indicating that a genuine issue of fact exists. If the evidence [presented by the non-moving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (internal quotations and citations omitted) (alteration in original).

The same standard of review applies when the Court is faced with cross-motions for summary judgment, as here. *See Lauria v. Heffernan*, 607 F. Supp. 2d 403, 407 (E.D.N.Y. 2009)

(citations omitted).  When evaluating cross-motions for summary judgment, the Court reviews each party's motion on its own merits, and draws all reasonable inferences against the party whose motion is under consideration.  *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

## DISCUSSION

### I.     Breach of Contract

Defendants contend they did not breach the Agreement by failing to pay Plaintiff's Debt Reduction Fee.  Because a breach of contract claim requires proof of "adequate performance by the plaintiff," (Defs. Mem. at 26 (citing *Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011)), "summary judgment is appropriate," Defendants argue, because (1) the Agreement "expired before any terms of the underlying transactions were agreed to"; (2) "Plaintiff's efforts did not 'result' in the underlying transactions"; and (3) "there was no reduction of debt."  (Defs. Mem. at 26.)  Plaintiff also contends it is entitled to summary judgment.  Plaintiff argues (1) "the fee obligation survived the termination of the Consulting Agreement"; (2) it brought "the linchpin of the deals to the table" and supplied Triangle with "knowledge to make its decision to join forces with Taconic" and ultimately "resell the notes to Defendants' affiliates"; and (3) the Transactions resulted in a reduction in debt, and any argument to the contrary is playing with "semantics."  (Plf. Mem. at 27–29.)

The Agreement is governed by New York law.  (Agreement at § 9.)  "Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages."  *Fischer & Mandell, LLP v. Citibank*, N.A., 632 F.3d 793, 799 (2d Cir. 2011).  A court should only grant summary judgment "if the terms of the contract are unambiguous."  *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008).  A contract is ambiguous where "a reasonably intelligent person viewing the contract

objectively could interpret the language in more than one way." *Id.* To the extent a party's summary judgment motion "hinges on ambiguous contract language," a court may grant summary judgment "only if the ambiguities may be resolved through extrinsic evidence that is itself capable of only one interpretation, or where there is no extrinsic evidence that would support a resolution of these ambiguities in favor of the nonmoving party's case." *Id.*

We turn first to whether the Transactions resulted in a debt reduction within the meaning of the Agreement. If Plaintiff did not secure a debt reduction for Defendants, then Plaintiff is not entitled to the Debt Reduction Fee.

### A.  Whether Transactions Resulted in Debt Reduction

The Agreement, as amended, is unambiguous. Defendants are obligated to pay the Debt Reduction Fee, "as specified on Schedule A," where a transaction results in "the reduction or forgiveness of the agreement amount under a loan." (Agreement § 5.) In the original Agreement, Schedule A states that a restructuring that "modifies any portion of the debt into a Hope Note/Subordinate Note (an 'A/B Split') would be classified as Debt Reduction." (Defs. Ex. A at Ex. 1.) Schedule A was modified by the parties in an amendment dated November 17, 2015. (*Id.* at Ex. 4.) The amendment likewise contemplates payment of a fee for a "modification involving" an "A/B Split":

> i.  The Debt Reduction Fee schedule shall be 10% of any debt forgiveness including accumulated non-default interest.
>
> ii.  The Debt Reduction Fee shall not be less than $250,000 or greater than $2,000,000.
>
> > 1.  Notwithstanding the forgoing, the payment schedule and fee shall be determined as follows:
> >
> > > a.  Upon the execution of a modification involving an A/B Split documents with the Lender, Borrower shall pay Consultant an amount equal to 2% of the B-Note/Hope Note/Subordinate

> Note or however it shall be classified (the 'A/B Mod Fee'). This fee, however, shall not be less than $250,000.
>
> b. Upon the repayment of the loan, Borrower shall pay Consultant a Debt Reduction Fee in the amount of 10% of the actual debt reduction achieved minus the A/B Mod Fee already paid. For avoidance of doubt if 10% of the debt reduction achieved is equal to or less than the A/B Mod Fee already paid, no additional payment will be due.

(*Id.*)  In effect, Defendants may be obligated to pay a Debt Reduction Fee in one of two situations: where (1) a transaction results in "the reduction or forgiveness of the agreement amount under a loan"; or (2) a transaction is a "modification involving" an "A/B split."  Although the type of transaction will affect *how much* Plaintiff is entitled to recover, both types of transactions are unambiguously subject to the "Debt Reduction Fee" as specified in Schedule A.

Defendants concede that "pursuant to the explicit language" in Schedule A, Plaintiff "might have been entitled" to "2% of the respective 'B' Notes, with any Debt Reduction Fee . . . to await the subsequent actual repayment of the several Notes." (Defs. Mem. at 26.)  Defendants, however, argue the Court should find the Transactions do not reflect an "A/B Split" within the meaning of Schedule A because Mr. Chopp said as much in his deposition testimony.  (*Id.* at 26–27 (citing Chopp Tr. 633:3-634:3, 637:1-14, 640:7-9).)  This Court, however, need not turn to extrinsic evidence to define Schedule A's meaning: the Agreement is clear and unambiguous on its face.  If Plaintiff's actions resulted in an "A/B Split," Plaintiff is entitled to a fee under Schedule A.

At minimum, the Transactions may constitute an "A/B Split" as specified in Schedule A. Although Defendants argue Mr. Chopp "forcefully den[ied] that the transactions that occurred represent an 'A/B Split'" (*Id.* at 27.), Defendants ignore the substance of Mr. Chopp's testimony. Mr. Chopp contends that the Transactions look like an "A/B Split" for tax purposes but in actuality result in debt reduction because parties affiliated with Defendants now hold the subordinated debt.

(Plf. Opp. at 24 n.14 (citing Chopp Tr. 640:6-15).)  CPS argues the Transactions are, in reality, a debt reduction masquerading as an "A/B Split."  (*Id.*)  Even if CPS is wrong and the "A/B Split" is just that—an "A/B Split"—Defendants have proffered no evidence to suggest Schedule A no longer applies and Plaintiff is no longer entitled to a fee for actions resulting in an "A/B Split."  To the contrary, the nature of the Transactions matches the parties' understanding of an "A/B Split."  The parties agree an "A/B Split" is a "standard way of restructuring a loan" in which the debt is split into multiple notes equaling the total value of the original loan.  (Defs. 56.1 at ¶ 29.)  Some of these notes are subordinated to others.  Here, the "A" Notes are secured by Phoenix Hotel and Minneapolis Hotel, respectively, the "B" Notes are unsecured and subordinated to the "A" Notes, and the "C" Notes are unsecured and subordinated to the "B" Notes.  (*Id.* at ¶¶ 96, 100.)  Moreover, the "combined face value of the replacement Notes equals the indebtedness outstanding" on the respective original Loans.  (Defs. 56.1 at ¶ 98.)  At the very least, a genuine dispute of material fact exists as to whether the Transactions constitute an "A/B Split" subject to Schedule A's provisions.

Now this Court considers whether a reasonable juror could find the Transactions were in fact "reduction[s] or forgiveness of the agreement amount[s]" of the original Loans, not merely the "A/B Split" they appear to be on their face.  If the Transactions are in fact a "reduction or forgiveness of the agreement amount," then Plaintiffs may recover "10% of any debt forgiveness," as specified in paragraph b(i) of Schedule A.  Defendants argue that the "face amount" of the replacement notes is "equal to the outstanding debt" prior to the Transactions.  (Defs. Mem. at 25.)  In other words, Columbia Phoenix and Columbia Minneapolis owe the original outstanding amount of the Phoenix and Minneapolis Loans, approximately $66.1 million and $59.8 million, respectively.  (Plf. 56.1 at ¶¶ 107, 109.)  Defendants disagree with Mr. Chopp's argument that CPS

is "entitled to the difference between the amount of the existing debt and the amount that was paid to purchase it." (Defs. Mem. at 27 (citing Chopp Tr. 618:22-619:8).) Defendants also disagree with Plaintiff's argument that Plaintiff is entitled to a fee because "the amount of the debt that was *collateralized* was reduced." (*Id.* (emphasis in original).) In this sense, Defendants are correct: the Agreement clearly and unambiguously requires any transaction reduce the "aggregate amount" of outstanding debt, not just the "collateralized" debt. This understanding of the contractual language matches the parties' intent: to Mr. Ballad, for example, "the initial object of [CPS's] engagement . . . was to reduce the amount of the loan period." (Ballad Tr. 23:13-18.)

Plaintiff, however, contends the New Loan Purchasers—specifically those holding the subordinate notes—are affiliated with Defendants and may have reason to not demand full payment of the subordinated debt. (Plf. Reply at 8 n.5.) The Transactions, argues Plaintiff, are discounted loan pay-offs. To state otherwise is to "ignore[ ] the reality that the replacement B and C Notes are *de facto* unenforceable." (*Id.* (citing *Chem. Bank v. Meltzer*, 93 N.Y.2d 296, 304 (1999) (refusing to adopt an interpretation of an agreement that would "elevate form over substance," "obfuscate the nature" of a party's "legal obligations," and "gloss over the essential character of [a] transaction")).) The "B" Notes are held by CSC Holdings, and the "C" Notes are held by members of Yung family. (Plf. Ex. 34, 40.) Columbia Sussex owns CSC Holdings, and CSC Holdings in turn owns hotels and is the parent company of Columbia Phoenix and Columbia Minneapolis. (Ballad Tr. 282:21-283:4.) The Yung family, meanwhile, "owns and controls all of the companies" "through various family trusts." (Ballad Tr. 108:18-25.) Because affiliated entities now hold a significant portion of Defendants' debts, Columbia Phoenix and Columbia Minneapolis may not face repercussions for non-payment. Indeed, Columbia Minneapolis is yet to pay interest on the subordinated debt. (Defs. Opp. Ex. BB at ¶ 2.) If they are relieved from

17

payment on the subordinated debt, Columbia Phoenix and Columbia Minneapolis will owe payment to Ladder Capital alone for an amount of outstanding debt far less than the amount due under the original Loans. Accordingly, a genuine dispute of material fact exists as to whether the Transactions are properly classified as "A/B Splits" or in fact constitute a "reduction or forgiveness of the agreement amount" under the original Loans. *See Sumitomo Mitsui Banking Corp. v. Credit Suisse*, 933 N.Y.S.2d 234, 237 (2011) (reserving for the jury a question of whether transaction at issue constituted (a) "a cash payment to satisfy the Bridge Loan" or (b) "a reallocation of debt," and observing that "it is the economic substance of a transaction that should determine the rights and obligations of interested parties").

This Court now addresses whether the Debt Reduction Fee, if applicable, survived termination of the Agreement.

### B. Whether Debt Reduction Fee Survived Termination of the Agreement

Section 5 of the Agreement, in relevant part, states as follows:

[I]n the event the actions of Consultant result, directly or indirectly, in an agreement or arrangement full [sic] executed and entered into between Borrower and Lender, for the reduction or forgiveness of the aggregate amount due under a Loan, Borrower shall be obligated to pay to Consultant a fee as specified on Schedule A (each, a "Debt Reduction Fee"). This fee payment obligation shall survive any termination.

. . .

Consultant shall be entitled to payment of a Debt Reduction Fee for each Loan for which Consultant provided Consulting Services regardless of whether execution of the documents evidencing the amendment, modification, recasting, restructuring, release, debt reduction, discounted payoff or other transaction to which the Consulting Services related occurs prior to or after the expiration of the Term, or termination of this agreement.

Defendants argue this "plain language" "precludes" Plaintiff's recovery because the provision "unambiguously requires that there have been an actual transaction substantially agreed upon

during the term of the Agreement, so that a delay merely in 'documenting' that transaction would not deprive Plaintiff of its fee." (Defs. Mem. at 22.) Mr. Chopp acknowledges it is "very possible that there could be a deal ongoing, but not finalized and papered until such time as the deal closes." (Chopp Tr. 201:24-202:5.) Seizing on Mr. Chopp's testimony, Defendants argue the "provision deals only with the timing of the 'papering' or 'documenting' of a 'deal' substantially arrived at"; "here, no deal was arrived at during the term of the Agreement," and "not a single aspect of such a deal had been agreed to." (Defs. Mem. at 22.) Plaintiff counters that Defendants "cherry pick one word from a paragraph in Section 5 and ignore the context surrounding the term 'execution.'" (Plf. Opp. at 19.) Plaintiff concludes that "the timing of the execution or papering of the transaction that CPS's actions produced is irrelevant so long as CPS's actions led to the agreement itself." (*Id.*)

Plaintiff is correct. The Agreement is clear and unambiguous: if the "actions" of Plaintiff "result, directly or indirectly" in an "agreement or arrangement full[y] executed and entered," the fee payment obligation survives termination of the Agreement "regardless of whether execution" of the documents "evidencing" the transaction occurs prior to termination. Defendants' interpretation builds a bridge too far. Although the language is clear that the fee payment obligation survives termination "regardless" of whether the documents are executed before termination, no language exists to suggest an agreement must be "substantially arrived at" before termination. Nor should the Court read such language into the Agreement. To do so would lead to absurd results. *See, e.g., Greenwich Capital Fin. Prods., Inc. v. Negrin*, 74 A.D.3d 413, 416 (N.Y. App. Div. 1st Dep't 2010) ("[A] contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties." (internal quotations omitted)). For example, even if Plaintiff *directly* gathered all the relevant

parties to a transaction and participated in preliminary negotiations, Defendants could terminate the Agreement and avoid payment because an agreement was not "substantially arrived at" before termination.   That would hold true even if mere days elapsed between termination and a "substantially arrived at" agreement.  Such an interpretation would empower Defendants to "avoid payment and use . . . [CPS's] processes and . . . strateg[ies] . . . in place and in the process of being executed to ultimately close a deal."  (Chopp Tr. 201:6-9.)  Accordingly, even if the Transactions were not substantially arrived at prior to termination, Plaintiff may still recover a Debt Reduction Fee so long as Plaintiff's "actions" resulted "directly or indirectly" in the Transactions.

This Court now turns to whether Plaintiff's actions "directly or indirectly" resulted in the Transactions.

### C.  Whether Plaintiff's Actions Directly or Indirectly Resulted in the Transactions

Plaintiff is entitled to a Debt Reduction Fee if its actions resulted "directly or indirectly" in an executed "agreement or arrangement . . . for the reduction or forgiveness of the aggregate amount due under a Loan."  (Agreement § 5.)  Plaintiff concedes its actions did not "directly" result in the Transactions, as "[d]irect would be where [CPS] was involved in the ultimate deal all the way until the end."  (Chopp Tr. 201:3-5.)  As Defendant correctly states, the Agreement does not define the term "indirectly."  (Defs. Mem. at 23.)  Mr. Chopp's testimony suggests "[i]ndirect would be if the client . . . use[d] . . . actions and processes . . . in place and in process of being executed to ultimately close a deal."  (Chopp Tr. 201:6-9.).

Defendants argue Mr. Chopp's testimony is "consistent with case law."  (Defs. Mem. at 24.)  Defendants cite to *Sibbald v. Bethlehem Iron Co.*, 83 N.Y. 378 (1881), in which the New York Court of Appeals held that a sales agent would earn a commission if his actions resulted in a sale "either directly, or as its efficient and producing cause."  *Id.* at 380.  Isolating the words "either

. . . , or," Defendants contend "*efficient and producing* cause" is an "alternative" to the term, "direct." (Defs. Mem. at 24.) In other words, an "efficient and producing cause" is equivalent to an "indirect" cause. (*See id.*) The Court concluded that the agent earned his commission by "bring[ing] the minds of the buyer and seller to an agreement for a sale, and the price and terms on which it is to be made." *Sibbald*, 83 N.Y. at 382. Defendants apply *Sibbald* to the facts here, arguing "[i]t is undisputed that Plaintiff did not negotiate or even contribute a single term, structure, or any other aspect of the transactions that Mr. Ballad subsequently negotiated and entered into with Mr. Jordan and Taconic." (Defs. Mem. at 25.)

Plaintiff disagrees. For one, Plaintiff observes that *Sibbald* addresses the services of a real estate broker, which are "different" and "more limited" than the consulting services CPS provided. (Plf. Opp. at 21 (citing Agreement at 1).) Further, Plaintiff points out courts have interpreted *Sibbald* to mean a broker must either directly cause the transaction or serve as the "direct and proximate link." (Plf. Opp. at 20, 22 (citing *Douglas Elliman, LLC v. Silver*, 136 A.D.3d 658, 660 (N.Y. App. Div. 2d Dep't 2016) and *Greene v. Hellman*, 51 N.Y.2d 197, 206 (1980)).) In effect, Plaintiff argues, "[b]ringing the minds of the buyer and seller to an agreement for sale" and setting the "price[ ] and terms on which the sale is to be made" "constitutes the direct and proximate link under *Sibbald*." (Plf. Opp. at 21–22.) Put differently, "direct and proximate," as defined in *Sibbald*, does not equate to "indirectly" as used in Section 5 of the Agreement. (*Id.* at 22.) Instead, "indirect" simply means Plaintiff "contributed" to the Agreement. (*Id.*) To that end, Plaintiff believes it fulfilled its obligations: it "procured the Triangle half of the Triangle-Taconic joint ventures" and "provided these parties with the knowledge of what Defendants were likely to pay"

to purchase the Loans.  (*Id.* at 22–23.)  Without these "contributions," argues Plaintiff, "neither transaction would have occurred."  (*Id.* at 23.)

The Agreement's use of "indirect" is ambiguous and subject to competing interpretations. This Court, however, finds Defendants' answer more compelling.  Plaintiff fails to establish that its interpretation of "indirect" captures the parties' intent.  Mr. Chopp's testimony, for example, suggests a definition of "indirect" that is incapable of precise meaning.  To state, as Mr. Chopp does, that any "contribution" may constitute "indirect" action is to render the word "action" meaningless.  (Chopp Tr. 202:16.)  Mr. Chopp's testimony demonstrates as much: he concedes that, "under certain circumstances," introducing "someone to someone else" may entitle him to a "$2 million fee.  (*Id.* at 202:17-22.)  When pressed by Defendants' counsel, Mr. Chopp doubled down, arguing Defendants are "wrong" to suggest he "may not have a case for the fee" based on "just [the] introduction" of Mr. Pinewski to Mr. Ballad.  (*Id.* at 204:18-21.)  Plaintiff's interpretation sets the floor too low for the types of actions that would entitle Plaintiff to a fee.

Defendant's interpretation is more apt.  Plaintiff concedes that "direct" actions "would be where [Plaintiff] was involved in the ultimate deal all the way until the end."  (Chopp Tr. 201:3-5.)  Mr. Chopp further testified, "indirect . . .  would be if the client . . . use[d] . . . actions and processes . . . in place and in process of being executed to ultimately close a deal."  Defendants agree this type of "material, substantive contribution to the transaction" is "consistent" with caselaw.  Defendants are correct.  *Sibbald* and its progeny establish a test for assessing whether a broker's *non-direct* actions—in other words, where broker is not "involved in the ultimate deal all the way until the end"—entitles a broker to a commission.[5]  *See, e.g., Saunders Ventures, Inc. v.*

---

[5] The Court is not persuaded by Plaintiff's argument that *Sibbald* is an "incorrect[ ] analogy" because *Sibbald* involves real estate services, as opposed to the consulting services provided by CPS.  (Plf. Opp. at 21.)  Assuming CPS's consulting services are broader than real estate services, Plaintiff was compensated for those additional services,

*Catcove Grp., Inc.*, 176 N.Y.S.3d 331, 334 (N.Y. App. Div. 2nd Dep't 2022) ("[I]n order to qualify for a commission, a broker need not have been involved in the ensuing negotiations or in the completion of the sale, if such a direct and proximate causal link exists." (internal quotations omitted)).  In assessing whether a broker's non-direct actions are sufficient, courts set a floor for the types of actions that would entitle a broker to a fee.  "However variable the judicial terminology employed to express the requirement that the broker must be the procuring cause," courts have "long . . . recognized" "that there must be a direct and proximate link . . . between the bare introduction [of parties] and the consummation" of a transaction.  *Greene*, 51 N.Y.2d at 206 (explaining it would grant summary judgment even if plaintiff had "introduced to each other parties who otherwise would have never met" or "created impressions which, under later and more favorable circumstances, naturally [led] to and materially [assisted] in the consummation of a sale). In sum, this Court determines the parties intended "indirect" to constitute a "meaningful, substantive contribution" to a transaction (Def. Opp. at 26), such that a "direct and proximate link" exists "between the bare introduction [of parties] and the consummation" of that transaction. *Greene*, 51 N.Y.2d at 206

Even though this Court ascertains the meaning of "indirect" as a matter of law, a genuine issue of material fact exists as to whether Plaintiff's actions amounted to an "indirect" contribution to the Transactions.  Defendants cite competent evidence to suggest (1) Mr. Chopp did not negotiate a single term of the final agreements between Defendants and the Triangle-Taconic joint ventures (Defs. 56.1 at ¶ 90); (2) Mr. Chopp did not introduce Defendants to Taconic (*id.* at ¶ 76);

---

such as "general consulting services." (*See, e.g.,* Agreement at 1, ¶ 2.)  Plaintiff, however, was only entitled to a Debt Reduction Fee if its actions resulted in a requisite transaction; real estate brokers are likewise only entitled to a commission if their actions result in a requisite transaction.  Plaintiff identifies no meaningful difference between the two services, or, at the very least, a difference which would hold consulting services to a *lesser* standard in claiming a commission or fee.

and (3) no term sheet existed prior to the termination of the Agreement (*id.* at ¶ 80).  Plaintiff, however, responds with a different account, likewise supported by competent evidence: (1) Mr. Chopp introduced Mr. Ballad to Mr. Pinewski, and he liaised between Mr. Ballad and Triangle— a minority partner in the Transactions—throughout the pendency of the Agreement (Plf. 56.1 at ¶¶ 59, 63, 64); (2) Mr. Chopp provided knowledge to Triangle of what Defendants were likely to pay to purchase the Loans (*id.* at ¶ 80); and (3) Taconic never would have partnered with Triangle and completed the Transactions but for Mr. Chopp's efforts (Plf. 56.1 at ¶ 139).

Accordingly, this Court denies both parties' motions for summary judgment on Plaintiff's breach of contract claims.  The jury is entrusted to determine (1) whether the Transactions are properly classified as an "A/B Split" or as a "reduction or forgiveness of the agreement amount" under the original Loans; and (2) whether Plaintiff's actions "indirectly" resulted in the Transactions.

This Court now turns to whether either party is entitled to summary judgment on Plaintiff's claim for unjust enrichment.

## II.    Unjust Enrichment

Defendants argue (1) the existence of an express contract bars any claim for unjust enrichment, and (2) in the absence of an express contract, any claim for unjust enrichment is barred by New York's Statute of Frauds for brokers' and finders' fees.  (Defs. Mem. at 28–30.)  Plaintiff avers that the Statute of Frauds does not apply to Plaintiff's services and, even if it does, "contemporaneous writings evidence an agreement between CPS and Defendants and reflect an understanding that Defendants had to pay CPS for the work being performed."  (Plf. Opp. at 28.)

Under New York law, an unjust enrichment claim requires "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require

restitution." *Kaye v. Grossman*, 202 F.3d 611, 616 (2d. Cir. 2000) (internal quotation marks omitted). However, "unjust enrichment is not a catchall cause of action to be used when others fail." *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012). "An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." *Izquierdo v. Mondelez Int'l, Inc.*, No. 16-CV-04697 (CM), 2016 WL 6459832, at *10 (S.D.N.Y. Oct. 26, 2016) (quoting *Corsello*, 18 N.Y.3d at 790–91) (internal quotation marks omitted).  In other words, "the existence of a valid contract governing the subject matter generally precludes recovery in quasi contract for events arising out of the same subject matter." *EBC I, Inc. v. Goldman, Sachs & Co.*, 5 N.Y.3d 11, 23 (2005).  A plaintiff may not recover for unjust enrichment where a contract expires and a plaintiff fails to prove "that it incurred any expense apart from its performance of the contract during the contractual term." *Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*, 157 F. Supp. 3d 352, 371 (S.D.N.Y. 2016), *aff'd*, 850 F. App'x 38 (2d Cir. 2021) (holding that plaintiff cannot "recover for its failed efforts in brokering an agreement in 2006-2007 because defendant, several years after the contract expired, eventually benefitted from those efforts").

At the outset, Plaintiff's claim for unjust enrichment is dismissed to the extent it "duplicates" Plaintiff's claims for breach of contract.  As such, Plaintiff's actions prior to the Agreement's expiration on December 31, 2016 cannot form the basis of its equitable claim. Accordingly, this Court will only consider Plaintiff's actions occurring after December 31, 2016.

The New York Statute of Frauds provides as follows:

> Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking: is a contract to pay compensation for services rendered in negotiating a loan, or in negotiating the purchase, sale, exchange, renting or leasing of any real estate or interest therein, or of a business opportunity . . . . "Negotiating" includes procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction. This provision shall apply to a contract implied

in fact or in law to pay reasonable compensation but shall not apply to [certain professions].

N.Y. Gen. Obl. Law § 5-701(a)(10) (McKinney).  Plaintiff's consulting services plainly fall within the reach of the statute.  Plaintiff tries to circumvent the statute by arguing its actions, such as arranging the January 2017 tours of the Phoenix and Minneapolis Hotels, are not "services rendered in negotiating a loan" or a "business opportunity."  (Plf. Opp. at 29.)  But Plaintiff's actions, including the arrangement of site tours, were done *in service of* negotiating a restructured loan and in the process securing a business opportunity for Defendants.  *See, e.g., Orderline Wholesale Distributors, Inc. v. Gibbons, Green van Amerongen, Ltd.*, 675 F.Supp. 122, 128 (S.D.N.Y.1987), ("[T]he New York Court of Appeals held that 'negotiating a business opportunity' within the meaning of 5–701(a)(10) includes the use of 'connections,' 'ability,' and 'knowledge' to facilitate or assist in the transaction by helping the acquirer of the business opportunity meet the right people and have the right information.").  Because the Statute of Frauds applies, this Court now turns to whether a "sufficient memorandum" exists to "evidence the fact of plaintiff's employment by defendant to render the alleged services."  *Morris Cohon & Co. v. Russell*, 23 N.Y.2d 569, 575–76 (1969).

The record reveals five emails exchanged between the parties that could "evidence the fact of plaintiff's employment by defendant to render the alleged services."  *Id.*  On January 6, 2017, Mr. Chopp emailed Mr. Ballad to inform him of a call from Mr. Pinewski in which Mr. Pinewski acknowledged the Triangle-Taconic joint ventures were finalizing the acquisitions of the Phoenix and Minneapolis Loans.  (Plf. Ex. 12.)  Mr. Chopp also relayed that Mr. Pinewski had requested a meeting with Defendants to "negotiate and finalize a deal" related to the Loans.  (*Id.*)  Mr. Ballad acknowledged the email and requested a February meeting date.  (*Id.*)  Mr. Chopp and Mr. Ballad communicated back-and-forth to finalize a meeting date.  (Plf. Ex. 25.)  After Mr. Pinewski

requested a meeting with Defendants to "negotiate and finalize a deal" related to the Loans, he then requested a tour of the Phoenix and Minneapolis Hotels, which Mr. Chopp and Mr. Ballad together coordinated. (Plfs Exs. 23, 24.) Lastly, Mr. Chopp relayed Taconic's pre-negotiation agreements to Mr. Ballad in advance of Defendants' February 9, 2017 meeting with Taconic and Triangle, and Mr. Ballad responded with a question regarding Mr. Chopp's knowledge of Taconic. (Plf. Ex. 28.)

Here, the foregoing communications evidence Defendants' "engagement of the plaintiff's services in connection with a transaction that was later brought to fruition." *Springwell Corp. v. Falcon Drilling Co.*, 16 F. Supp. 2d 300, 314 (S.D.N.Y. 1998) (refusing to dismiss plaintiff's quantum meruit claim where defendant's letter acknowledged plaintiff "was in fact of service" to defendant "in dealing with" third party). The emails, though failing to reflect all material terms of the parties' agreement, "establish clearly the existence of the alleged finder's agreement and its subject matter." *Id.* at 305. Mr. Ballad used CPS's services as though the Agreement had never expired, coordinating site tours and a meeting with parties to the Transactions, signing pre-negotiation agreements sent by Taconic through Mr. Chopp, and asking Mr. Chopp for his knowledge of Taconic. Sophisticated parties, like Defendants, should "reasonably expect[ ] that such services were not to be performed gratuitously." *Shapiro v. Dictaphone Corp.*, 66 A.D.2d 882, 885 (N.Y. App. Div. 2nd Dep't 1978) (denying defendant's motion for summary judgment on plaintiff's quantum meruit claim where contemporaneous writing showed the "subject matter" of the purported agreement, "plaintiff's role," and "the fact that plaintiff's services were never intended to be gratuitously furnished"). Regardless of how "helpful" Plaintiff was to Defendants (Defs. 56.1 Resp. at ¶ 54), Defendants cannot hide behind the Statute of Frauds where, as here,

they explicitly accepted Plaintiff's services—rendered in furtherance of the same Transactions contemplated by the Agreement—on multiple occasions following the Agreement's expiration.

This Court, however, cannot decide as a matter of law that "defendant benefitted"—"at the plaintiff's expense"—and "that equity and good conscience require restitution."   *Kaye v. Grossman*, 202 F.3d 611, 616 (2d. Cir. 2000).  As stated previously, *see supra* Discussion § I, it is unclear the extent to which (1) Defendants benefitted; (2) Plaintiff incurred expense after the Agreement expired; and (3) Defendants benefitted *at* Plaintiff's expense.  On the one hand, Defendants cite to competent evidence to suggest Defendants did not benefit *at* Plaintiff's expense because Plaintiff did not contribute a single term to the Transactions.  (Defs. 56.1 at ¶ 90.)  On the other hand, Plaintiff cites to competent evidence that but-for Plaintiff liaising between Mr. Ballad and Mr. Pinewski, the Transactions would have never occurred.  (Plf. 56.1 at ¶ 139.)  In so concluding, this Court also acknowledges that the link between Plaintiff's post-expiration actions and the final transactions may prove tenuous.  For that reason, this Court also entrusts the jury to assess whether "equity and good conscience require restitution" in light of Plaintiff's efforts.

Accordingly, this Court denies both parties' motions for summary judgment on Plaintiff's unjust enrichment claim.

III. **Account Stated**

Defendants argue summary judgment on Plaintiff's account stated claim is warranted because "no 'account' existed at the [relevant] time," the claim is "duplicative" of Plaintiff's contract claims, and "there is no evidence that Defendants either 'accepted' the purported 'account' or that they ever agreed to pay it."  (Defs. Mem. at 31–32.)  Plaintiff argues Defendants did not timely object to Plaintiff's April 5, 2017 invoice, which was "due on receipt," and thus did not "prevent[ ] the existence of an implied agreement to the balance and agreement to pay as a

matter of law" because the objection was interposed after Plaintiff commenced the instant action. (Plf. Opp. at 35–36 (citing *White Diamond Co. v. Castco, Inc.*, 436 F. Supp.2d 615, 623 (S.D.N.Y. 2006) ("An objection to an account stated that is first made only after litigation on the account stated has been commenced is, as a matter of law, not made within a reasonable time.")).)

"To properly assert an account stated claim under New York law, a plaintiff must plead that (1) an account was presented, (2) it was accepted as correct, and (3) debtor promised to pay the amount stated." *Liddle & Robinson, LLP v. Garrett*, 720 F. Supp. 2d 417, 426 (S.D.N.Y. 2010) (internal quotations omitted). A plaintiff must demonstrate that the debtor accepted, whether explicitly or implicitly through actions, that the account was correct. *Id*. Acceptance of the account and a promise to repay may be implied if the party receiving the account statement "keeps it without objecting to it within a reasonable time." *LeBoeuf, Lamb, Greene & MacRae, LLP v. Worsham*, 185 F.3d 61, 64 (2d Cir. 1999) (quoting *Chisholm–Ryder Co. v. Sommer & Sommer*, 421 N.Y.S.2d 455, 457 (N.Y. App. Div. 4th Dep't 1979)).

Defendants clearly disputed—on two separate occasions—their obligation to pay Plaintiff any further fee, and as such, no reasonable juror could conclude that Defendants accepted the validity of Plaintiff's invoice. On February 8, 2017, Mr. Ballad emailed Mr. Chopp to inform him Defendants were terminating the Agreement. (Plf. Ex. 31.) Mr. Chopp responded that same day to remind Mr. Ballad of Defendants' obligation to pay "any fees or other amounts due or which may become due." (*Id*.) In so doing, Mr. Chopp displayed an awareness that Defendants were planning to dispute any fee Plaintiff might claim. Although Plaintiff had not invoiced Defendants in nearly 21 months (Defs. 56.1 at ¶ 104), Plaintiff sent Defendants an invoice on April 5, 2017 for the Debt Reduction Fee. (Plf. Ex. 39.) Plaintiff initiated the instant lawsuit on April 27, 2017 (ECF No. 1), but Defendants were not advised of the lawsuit until May 2, 2017. (Defs. 56.1 Resp.

at ¶ 143.)  Before receiving actual notice of the lawsuit, on April 28, 2017, Mr. Ballad sent a letter (1) reiterating his "previous confirmation" that the Agreement "expired in accordance with its terms" and (2) "reject[ing]" the invoice "as an attempt to manufacture the appearance of an obligation where none exists."  (Defs. Ex. B at Ex. A.)  Plaintiff has provided no contrary evidence to suggest explicitly, or implicitly through Defendants' actions, that Defendants "assent[ed]" to Plaintiff's April 5, 2017 invoice.  *Compare Genuity Solutions, Inc. v. Nortel Networks, Inc.*, No. 02 Civ. 7883 (LAK), 2002 WL 31802321, at *1 (S.D.N.Y., Dec. 13, 2002) (rejecting account stated claim where Defendants objected to invoice three days after the due date and on the same date Plaintiff filed a complaint related to the invoice) *with White Diamond Co. v. Castco, Inc.*, 436 F. Supp.2d 615, 623 (S.D.N.Y. 2006) (denying summary judgment on account stated claim where Plaintiff regularly submitted invoices to Defendants, who made partial payments on the invoices and "did not question the accuracy of the invoices," and where Defendants only objected through a conclusory declaration filed in litigation related to the invoices).

Accordingly, this Court grants Defendants' motion for summary judgment on Plaintiff's account stated claim, which is dismissed with prejudice.

This Court now turns to address Plaintiff's personal guaranty claim against Mr. Ballad.

## IV.   Personal Guaranty

Mr. Ballad argues "[i]t is undisputed that [he] signed the Consulting Agreement only once, as Chief Financial Officer and thus solely in his capacity as disclosed agent for his Columbia Phoenix principal, and not in his individual capacity."  (Defs. Mem. at 33.)  The parties, argues Mr. Ballad, "never discussed, much less 'negotiated[,]' the purported personal guaranty."  (*Id.* at 33 (citing and quoting Ballad Tr. 47:14-48:7).)  Mr. Ballad further argues the purported guarantee was not supported by bargained-for consideration.  (*Id.* at 37–38.)  Plaintiff contends Mr. Ballad,

30

who testified that "he was aware of the personal guarantee" and yet "chose not to negotiate or discuss it," cannot escape liability for the personal guaranty "based on his uncommunicated subjective belief that it would not be enforceable." (Plf. Opp. at 30.) Plaintiff further contends that (1) "consideration supports the Consulting Agreement containing the guaranty" and (2) by law, "a personal guaranty does not need separate, bargained-for, consideration to be enforceable." (*Id.* at 33.)

In New York, a prima facie case for breach of a written guaranty requires that a plaintiff establish (1) an absolute and unconditional guaranty, (2) the existence of an underlying debt, and (3) the guarantor's failure to satisfy the unpaid debt. *Myers Indus., Inc. v. Schoeller Arca Sys., Inc.*, 171 F.Supp.3d 107, 121 (S.D.N.Y., 2016) (citing *City of N.Y. v. Clarose Cinema Corp.*, 256 A.D.2d 69, 71 (N.Y. App. Div. 1st Dep't 1998)). "Broad absolute and unconditional guaranties are enforceable." *Bank of Am. v. WRT Realty, L.P.*, 769 F. Supp. 2d 36, 40 (D. Mass. 2011) (citing Red Tulip, LLC v. Neiva, 44 A.D.3d 204, 209 (N.Y. App. Div. 1st Dep't 2007)). To determine whether a personal guaranty ought be enforced, courts in the Second Circuit consider: "(1) the length of the contract, (2) the location of the liability provision(s) in relation to the signature line, (3) the presence of the signatory's name in the agreement itself, (4) the nature of the negotiations leading to the contract, and (5) the signatory's role in the corporation." *Cement and Concrete Workers District Council Welfare Fund v. Lollo*, 35 F.3d 29, 35 (2d Cir. 1994). "Although two signatures are not required in order to impose personal liability on the agent, the existence of only one signature weighs against imposition of personal liability." *Integrated Mktg. & Promotional Sols., Inc. v. JEC Nutrition, LLC*, No. 06 CIV. 5640 (JFK), 2006 WL 3627753, at *3 (S.D.N.Y. Dec. 12, 2006) (citing *Salzman Sign Co. v. Beck*, 10 N.Y.2d 63, 67 (1961) ("[W]here individual

responsibility is demanded the nearly universal practice is that the officer signs twice—once as an officer and again as an individual.")).

At the outset, Plaintiff cannot obtain summary judgment on its personal guaranty claim because a genuine dispute of material fact exists as to whether Defendants, including their guarantor, owe an "underlying debt" to Plaintiff pursuant to the terms of the Agreement. As previously stated, *see supra* Discussion §§ 1–2, if Plaintiff's actions did not result, either "directly or indirectly" in the transactions, then Defendants will not have incurred an underlying debt and Plaintiff's claim for personal guaranty will be of no avail. Although a genuine dispute of material fact thus exists as to whether Mr. Ballad owes an "underlying debt," no dispute exists as to whether Mr. Ballad paid that debt (to the extent it exists). He did not. This Court, however, still must consider whether Mr. Ballad's guarantee was "absolute and unconditional" so as to merit enforcement.

The question is best left to a jury. Defendants assert multiple undisputed facts, including that the "purported assignment of personal liability is but a single sentence buried in paragraphs whose headings do not indicate the existence of a personal guaranty," "Mr. Ballad's name appears nowhere in the body of the Agreement," and the parties never discussed a guaranty. (Defs. Mem. at 35.) On this view, Mr. Ballad does not have the requisite intent to bind himself to a personal guarantee. But Mr. Ballad's lack of intent is undermined by his own testimony: he makes clear that he *knew* the Agreement included a personal guaranty. (Ballad Tr. 46:2–6.) He simply chose to trust his apparent subjective belief that the personal guaranty provision was unenforceable. (*Id.* at 47:10-49:8.) Mr. Ballad further testified that because he was "tired of negotiating" and believed the provision had "no force or effect," he did not "raise the subject." (*Id.* at 47:14-18.) Put differently, Mr. Ballad understood the Agreement included a personal guarantee but chose not to

negotiate it out of the Agreement because he took a calculated risk a court would not enforce the guarantee.  Such risk-taking may have played to Defendants' advantage in gaining leverage during negotiations, and a jury may properly find Mr. Ballad intended to strike that bargain.  *See W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 163 (1990) ("By ignoring the plain language of the contract, plaintiff effectively rewrites the bargain that was struck.").  Although it is "nearly universal" for an officer "to sign twice—once in his representative capacity and again as an individual—where the corporate officer is to be held personally liable for his corporation's undertaking," a triable issue may arise where, as here, an agreement is only three pages long, resulted from heavy negotiation, and allowed a party ample opportunity to delete a known obligation from the agreement.  *Paribas Properties, Inc. v. Benson*, 146 A.D.2d 522, 525 (1989) (N.Y. App. Div. 1st Dep't 1989) ("[T]his is not a case in which a single sentence in a lengthy contract created a trap for an unwary agent.").

To the extent Mr. Ballad evinces an intent to bind himself to the Agreement, consideration supports the guarantee.  "Although guaranties do require consideration, they do not require consideration independent of that furnished in support of the contract in which the guaranty is housed."  *AXA Inv. Managers UK Ltd. v. Endeavor Cap. Mgmt. LLC*, 890 F. Supp. 2d 373, 382 (S.D.N.Y. 2012).  Moreover, "a guarantor connected to a corporate entity that stands to profit from a contract is deemed to have received consideration for his or her personal guaranty of the contract by virtue of any advantages that the company might derive from the contract as a whole."  *Id.* at

383.   Because none of the parties contest the bargained-for consideration supporting the

Agreement, Mr. Ballad cannot rely upon a lack of consideration to undo his personal guarantee.

In light of the foregoing, this Court denies both parties' motions for summary judgment on

Plaintiff's personal guaranty claim.

This Court now turns to whether Plaintiff can sustain its claims against Columbia Sussex.

## V.   Related Entities Agreement

The Related Entities Agreement, in relevant part, reads as follows:

1.      Columbia Sussex Corporation ("CSC") hereby agrees that if and to the
extent that Consultant provides Consulting Services to CSC and/or to any affiliates,
subsidiaries and/or entities listed on Exhibit A hereto (collectively, "Related
Entities"), said Consulting Services shall be each subject to, and be each governed
by, all of the terms, provisions, covenants and conditions (including, without
limitation, Schedule A) of the Agreement, but only to the extent that CSC and/or
the Related Entities retains ownership of the associated properties.   For the
avoidance of doubt, if any Related Entity's loan is not (a) restructured with CSC or
an affiliate under an agreement that provides for CSC or an affiliate to retain
ownership and control or (b) acquired by CSC or an affiliate via a note purchase or
discounted payoff, no Debt Reduction Fee, Modification Fee, or Capital Fee shall
be payable by CSC in respect of such entity.

Notwithstanding the foregoing, in the event any Related Entities' loan is
restructured under an agreement that provides for CSC or an affiliate to retain
ownership in a joint venture arrangement but not control, a Fee will nonetheless be
due, with the specific amount to be mutually agreed upon by and between CSC and
Consultant prior to the execution of said restructuring agreement.

. . .

2.      The undersigned (Columbia Sussex, through its corporate agent Mr. Ballad)
represents and warrants that (i) such party has full power to enter into this letter
agreement on behalf of itself and the Related Entities, and to consummate the
transaction provided for herein. . . .

(Defs. Ex. A. at Ex. 2.)  Defendants argue "[t]here is absolutely no language in the Related Entities

Agreement that could remotely be deemed to express an intention on the part of Columbia Sussex

– or any of the Related Entities – to guarantee payment of an obligation owed by any other Related

Entity." (Defs. Mem. at 39.) Defendants further argue the "intention of the document" was that if Plaintiff was "able to negotiate a deal that resulted in a debt reduction for any of these other entities," Plaintiff "would be entitled to a fee from those entities." (*Id.* (citing Chopp Tr. 250:20-251:20).) Because Plaintiff "admits that Columbia Sussex was not the borrower on either of the loans at issue" (*id.* (citing Chopp Tr. 253:9-12)) and that Plaintiff "was not hired to and never did any type of modification or other work for Columbia Sussex" (*id.* (citing Chopp Tr. 255:1-6)), Defendants conclude Columbia Sussex owes Plaintiff no obligation. Plaintiff, meanwhile, accuses Defendants of "redrafting" the provision's plain language. (Plf. Opp. at 40.) Plaintiff also observes that Columbia Sussex "bound itself to pay CPS's fees when it entered into the Related Entities Agreement on its own letterhead [ ] and signed the agreement on all of its sub-entities behalves." (*Id.*)

At the outset, Columbia Sussex entered the Related Entities Agreement "on behalf of itself and the Related Entities." Columbia Sussex further acknowledged it had "full power" to do so. Put simply, Columbia Sussex cannot escape any obligations imposed by clear and unambiguous language in the Related Entities Agreement.

Here, this Court need not resort to extrinsic evidence. The Related Entities Agreement is clear and unambiguous: Columbia Sussex is obligated to pay for services CPS rendered to its affiliates, as identified in Exhibit A to the Related Entities Agreement. These affiliates (the "Related Entities") include, among others, Columbia Phoenix and Columbia Minneapolis. CSC agreed that *if* CPS provided its services to CSC *or* the Related Entities, those services would be governed by the terms of the Agreement, including Schedule A. In other words, CPS was entitled to payment for services rendered to CSC or the Related Entities, but only to the extent that CSC or a Related Entity retained ownership of the respective properties listed in Schedule A.

Admittedly, the first sentence of paragraph 1 of the Related Entities Agreement is passive, and thus there is no clearly identifiable entity responsible for payment to CPS.

That changes in the second sentence. "For the avoidance of doubt," the Agreement clarifies the first sentence and reiterates that no Debt Reduction Fee is payable *by* CSC *for* a Related Entity if that Related Entity's loan was not "(a) restructured with CSC or an affiliate under an agreement that provides for CSC or an affiliate to retain ownership and control or (b) acquired by CSC or an affiliate via a note purchase or discounted payoff." Incorporating the next paragraph, the Related Entities Agreement contemplates situations where "a Fee will nonetheless be due [for a Related Entity's loan], with the specific amount to be mutually agreed upon by and between CSC and Consultant," and others where the Fee will not "be payable by CSC" "in respect of a [Related Entity]." Put differently, to the extent the Related Entities Agreement articulates a party's obligation to pay (or not pay), that obligation rests with CSC, and CSC discharges that obligation "in respect of," or on behalf of, a Related Entity for services CPS rendered in "restructur[ing]" or "acquir[ing]" a Related Entity's loan. Columbia Sussex warranted its "full power to enter into [the Related Entities Agreement] on behalf of itself and the Related Entities," and it cannot now escape its obligation to pay Plaintiff for services rendered under the Agreement towards the Related Entities, namely Columbia Phoenix and Columbia Minneapolis.

Accordingly, this Court denies Defendants' motion for summary judgment for all of Plaintiff's claims against Columbia Sussex.

## CONCLUSION

Defendants' motion for summary judgment is GRANTED in part and DENIED in part. Defendants' motion for summary judgment is GRANTED with respect to Plaintiff's account stated

claim.  Plaintiff's account stated claim is dismissed with prejudice.  Defendants' motion for summary judgment is DENIED in all other respects.

Plaintiff's cross-motion for partial summary judgment is DENIED.

The parties are directed to appear for a telephonic pre-trial conference on May 3, 2023 at 2:00 p.m.  To access the teleconference, please follow these directions: (1) Dial the Meeting Number: (877) 336-1839; (2) Enter the Access Code: 1231334 #; and (3) Press pound (#) to enter the teleconference as a guest.

The Clerk of Court is directed to terminate the motions at ECF Nos. 68 and 77.


Dated:    March 27, 2023                                SO ORDERED:
          White Plains, New York

                                          _____
                                                 NELSON S. ROMÁN
                                              United States District Judge